The WOODHILL CORPORATION, Plaintiff–Appellant,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY, et al., Defendants–Appellees.

No. 98–2990.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1999.

Decided Feb. 22, 1999.

Johnine J. Brown (argued), Sheila H. Deely, Brownmartin P.C., Chicago, IL, for Woodhill Corp.

Lowell Sturgill (argued), Robert S. Greenspan, Susan L. Pacholski, Department of Justice, Civil Division, Appellate Section, Washington, DC, for Federal Emergency Management Agency.

Lowell Sturgill (argued), Dept. of Justice, Civil Division, Appellate Section, Washington, DC, Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, for James L. Witt and Frederick H. Sharrocks, Jr.

Before POSNER, Chief Judge, and COFFEY and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Structures located in a "special flood hazard area" are eligible for federal disaster relief only if covered by insurance under the National Flood Insurance Program established under 42 U.S.C. § 4011. See 44 C.F.R. § 59.2. Borrowers have an additional reason to purchase flood insurance: 42 U.S.C. § 4012a prohibits federally-regulated lending institutions from making loans on the security of a structure in a special flood hazard area unless flood insurance has been secured for the life of the loan. These rules make a special flood hazard area designation costly for persons who own property there and lead to disputes about boundaries.

The Federal Emergency Management Agency designates as a "special flood hazard area" the portion of a floodplain that the FEMA believes has a 1% or greater likelihood of inundation in any given year. Flood-control projects can change this probability; so can owners, who may change the grade or elevation of their land. Accordingly, the FEMA offers land owners the opportunity to seek changes in the maps that designate special flood hazard areas. Our case involves 44 C.F.R. § 65.5, captioned "[r]evision to special flood hazard area boundaries with no change to base flood elevation determinations." An owner proposing to increase elevation using fill may ask for a revision by submitting data specified in § 65.5(a):

(3) If a legally defined parcel of land is involved, a topographic map indicating present ground elevations and date of fill. FEMA's determination as to whether a legally defined parcel of land is to be excluded from the area of special flood hazard shall be based upon a comparison of the ground elevations of the parcel with the elevations of the base flood. If the ground elevations of the entire legally defined parcel of land are at or above the elevations of the base flood, the parcel may be excluded from the area of special flood hazard.

(4) If a structure is involved, a topographic map indicating structure location and ground elevations including the elevations of the lowest floor (including basement) and the lowest adjacent grade to the structure. FEMA's determination as to whether a structure is to be excluded from the area of special flood hazard shall be based upon a comparison of the elevation of the lowest floor (including basement) and the elevation of the lowest adjacent grade with the elevation of the base flood. If the entire structure and the lowest adjacent grade are at or above the elevation of the base flood, the structure may be excluded from the area of special flood hazard.

Woodhill Corporation, a residential developer, proposed to exclude an entire "legally defined parcel of land" under § 65.5(a)(3) by using fill to raise its elevation "above the elevations of the base flood". But the FEMA said no, informing Woodhill that because documents included with the submission implied that structures eventually would be constructed on the land, the submissions had to conform to § 65.5(a)(4), and in particular had to show that "the elevation of the lowest floor (including basement)" would be above "the elevation of the base flood". Woodhill resubmitted its request, omitting any hint that structures were in the offing. Once again the FEMA said no, this time asserting that because Woodhill's first submission showed that "a structure is involved" in Woodhill's plans, FEMA could not ignore this information when acting on the request. Woodhill then filed this suit under the Administrative Procedure Act and 42 U.S.C. § 4104, and the district court entered summary judgment for the FEMA. 1998 U.S. Dist. LEXIS 11621 (N.D.Ill.).

Subsection (a)(3) applies when "a legally defined parcel of land is involved", and subsection (a)(4) when "a structure is involved". The passive phrasing ("is involved") means that the distinction between the domain of § 65.5(a)(3) and that of § 65.5(a)(4) could be understood in at least four ways:

1. Whenever a structure is going to be built on the land, resort to (a)(4) is obligatory.
2. Whenever the FEMA has learned that a structure is planned for the land, (a)(4) supplies the exclusive avenue.
3. Whenever the application papers identify a structure to be built on the land, subsection (a)(4) controls.
4. Whenever the applicant seeks to exclude a structure rather than a parcel of land, subsection (a)(4) governs.

Woodhill prefers the fourth reading, though it would settle for the third. Both of its submissions sought to exclude a whole parcel; Woodhill does not want to exclude just the houses, yielding a Swiss-cheese map that would leave back yard swings in a "special flood hazard area." What a mess for homeowners seeking financing from federally insured banks that would be! For its part, the FEMA apparently prefers the second reading. By rejecting Woodhill's initial application, it condemned the fourth, and by rejecting Woodhill's revised application the FEMA ruled out the third. Acting on earlier applications from residential developers, including Woodhill itself, the FEMA must have rejected the first reading—for the FEMA has removed many parcels of residential-subdivision size, recognizing (if only from the identity of the applicant) that housing would be built eventually. But we use the weasel word "apparently" because what the FEMA has *not* done is choose among these readings explicitly, or give reasons for preferring one over another: not when it promulgated and amended § 65.5, not when it acted on Woodhill's applications, and, so far as we can tell, not anywhere else. Counsel from the Department of Justice representing the FEMA in this litigation professed confidence that reading two is right but conceded that the FEMA has never explained why it (as opposed to its appellate lawyer) selected this reading, and did not explain (either in the brief or on his feet) why reading two is preferable to reading one.

A court must accept any plausible understanding of a regulation adopted by the regulation's author. *Shalala v. Guernsey Memorial Hospital,* 514 U.S. 87, 94–97, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995); *Homemakers North Shore, Inc. v. Bowen,* 832 F.2d 408, 411–12 (7th Cir.1987). Sometimes it is enough if the interpretation is developed in litigation; a view of a text's meaning is no less authentic just because the agency first sees the need for precision once controversy breaks out. See *Japan Whaling Ass'n v. American Cetacean Society,* 478 U.S. 221, 233, 241, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986) (deferring to an executive construction that had been adopted during the litigation and was first proffered by affidavit). But the FEMA has been silent. It has not used this suit as an occasion to formulate a considered position; so far as we can see, the Department of Justice views itself as free to advance whatever interpretation will win this case, without regard to the FEMA's actual position—if indeed the head of the FEMA has one, which we doubt. Local officials acting

on Woodhill's application seem to have arrived at reading two by accident, without guidance from Washington, and we have not turned up anything suggesting that the Administrator of the FEMA has thought about this question. Accordingly we construe § 65.5(a) for ourselves, without deference to the position taken by the Department of Justice.

■ The most natural reading is the fourth: if the applicant proposes to remove just a structure from the special flood hazard area, then the structure must meet the requirements of § 65.5(a)(4), while if the applicant proposes to remove a parcel of land, then the parcel must meet the requirements of § 65.5(a)(3). The paradigm is a farm house or barn raised by fill to lie above the base flood elevation, although the bulk of the farm itself lies below that elevation. The reference in § 65.5(a)(4) to the "lowest adjacent grade" shows that this subsection is designed for portions of legally-defined parcels. When the structure and immediately "adjacent" land are above the base flood elevation, they may be removed from the special flood hazard area even though acreage elsewhere in the same parcel is below the base flood elevation. When the entire parcel has been filled to be above the base flood elevation, the whole parcel comes out under § 65.5(a)(3).

True enough, water might seep through the fill and damage a basement even if the flood water does not reach the ground level of the filled land. In order to protect the federal Treasury from claims by owners who fill land to one inch above the base flood elevation and then build below that elevation, the FEMA might want to require additional precautions. But § 65.5(a)(4) does not appear to address that possibility. Instead the defense lies in § 65.5(a)(6), which requires the fill to meet quality standards. What is more, if the FEMA fears that land will be removed from the flood map, uninsured structures will be built there, and the outlays for federal disaster assistance increase when floods damage basements, then why in the world would the FEMA select reading two over reading one? If it is really concerned about this risk, it would (i) foreclose the possibility of removing large parcels from flood maps; (ii) require developers to disclose their plans; or (iii) require basement elevations to be higher than the base flood elevations, as a condition of disaster assistance. But it has done none of those, and its preference for reading two of the current regulation must be called irrational. What sense could it make to remove a large parcel from the flood map if, and only if, the developer is close-lipped about its plans? What sense could it make to reward dividing the project into phases? Under the FEMA's reading, if Developer # 1 proposes to fill the land and represents that *it* has no plans to build anything, then the map will be revised, even if Developer # 1 plans to sell the filled land to Developer # 2 for construction.

What sense, indeed, does it make for the FEMA even to have a § 65.5(a)(3) if its submission in this suit is correct? The map is used to determine which parcels need insurance in order to qualify for loans or disaster relief. But flood insurance is limited to "improved real estate"—that is, to parcels that contain structures! 42 U.S.C. § 4012a(b). Unimproved or agricultural land need not be insured in order to be eligible for loans or federal relief. Thus someone would ask for revisions in the map *only* because structures are to be built; otherwise an application would be a waste of money. Indeed, the only reason to *fill* a parcel is to facilitate construction. If all current or contemplated structures must be handled under § 65.5(a)(4), what role is left for § 65.5(a)(3)? Our reading of § 65.5(a) gives both (a)(3) and (a)(4) distinctive roles—the former deals with entire parcels that after fill lie above the base flood elevation, and the latter with high ground in parcels that are generally below flood level. On this understanding the reference to the basement elevation in (a)(4) makes sense because water is more likely to flood a basement when only a small adjacent area is above the base flood level (the (a)(4) situation) than when the entire parcel is above the base flood level (the (a)(3) situation).

The FEMA's rejection of Woodhill's application rests on an error of law and therefore must be set aside under 5 U.S.C. § 706. The

1029

judgment of the district court is vacated, and the case is remanded with instructions to issue a judgment requiring the FEMA to reconsider Woodhill's application under § 65.5(a)(3).