# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3427

_____

Lucy M. Cross,

        Appellant,

        v.

Prairie Meadows Racetrack
and Casino, Inc.,

        Appellee.

\*  Appeal from the United States
\*  District Court for the
\*  Southern District of Iowa.

_____

Submitted: April 12, 2010
Filed: August 12, 2010

_____

Before WOLLMAN, HANSEN, and MURPHY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Lucy Cross appeals the district court's[1] grant of summary judgment to Prairie Meadows Racetrack and Casino, Inc. (Prairie Meadows) on her hostile work environment claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Iowa Civil Rights Act of 1965 (ICRA), Iowa Code § 216.1 et seq. We affirm.

_____

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa.

From August 2005 until September 2007, Cross worked at Prairie Meadows as a valet, parking cars on the night shift. Cross and the other valets on her shift were typically supervised by traffic supervisor Tony Fucaloro, who reported to the traffic manager, Bill Riddle. Although Fucaloro and Riddle were considered members of Prairie Meadows management, neither individual had the ability to hire, fire, promote, or reassign any of the valets. The Human Resources office had sole authority to terminate an employee.

When Cross began working at Prairie Meadows she was given a copy of the company's policy regarding harassment and violence in the workplace. The policy explained that Prairie Meadows had zero tolerance for sexual harassment and listed various ways that employees could seek help if they experienced harassing or violent behavior, including talking to a supervisor or directly contacting the Human Resources department. The policy stated that any member of management who received a complaint of sexual harassment was required to forward the complaint to Human Resources. If an employee was unhappy with the resolution of her complaint, the policy stated that she could address her concerns to upper level management and the company CEO. Cross read the policy and testified that she was aware that there were multiple effective avenues for reporting harassment.

In the summer of 2006, about one year after Cross began working at Prairie Meadows, Cross reported that she had had a problem with another valet named Semsudin Rizvic. According to Cross, Rizvic frequently pestered both his male and female coworkers, tripping them or taking their keys. Cross reported to Fucaloro that Rizvic had grabbed her pony tail and pulled her out of the valet shack, an area where the valets stored keys for the customers' vehicles. Fucaloro spoke about the incident with Rizvic and Sherry Chambers, a Prairie Meadows employee who had been nearby when it happened. Both Rizvic and Chambers confirmed that Rizvic had tugged

Cross's hair but characterized it as an instance of playful teasing, less severe than Cross had made it out to be. Fucaloro called the valets together and admonished all of them to avoid horseplay, but he did not report the incident to Human Resources or inform anyone else of Cross's complaint. According to Cross, Rizvic did not pull her hair again after this incident.

On another occasion, Rizvic brushed the back of his hand across Cross's breast in a purported attempt to wipe something off her shirt. Cross told Rizvic that his behavior was inappropriate and Rizvic laughed in response. When Cross informed Fucaloro about Rizvic touching her breast, Fucaloro discussed the matter with Rizvic but accepted Rizvic's justification that the contact was acceptable because Rizvic had touched Cross only with the back of his hand and only in an effort to brush something from her shirt. Neither Cross nor Fucaloro discussed the incident with Human Resources or any other member of management.

Cross also informed Fucaloro of an incident in which Rizvic had pulled a car in front of her as she was walking through the valet parking lot and asked her whether she liked him. Cross responded that she liked Rizvic only as a friend, causing Rizvic to angrily respond that he wanted to be more than friends. Rizvic banged his hands on the steering wheel and maneuvered the car to block Cross's path. Cross felt threatened and was frightened by the encounter. When Fucaloro heard about Rizvic's behavior he told Cross, "that's just Sam." Fucaloro did not investigate or report the matter, and Rizvic was not disciplined for his conduct.

On September 18, 2007, Denis Felic, another valet, told Cross that Rizvic had said that Cross had performed oral sex on Rizvic and that it had been "great." Cross confronted Rizvic, who denied ever making the statement. Cross and Rizvic had an angry exchange of words, after which Cross sought out a supervisor to whom she could report the incident. Mike Russo, another traffic supervisor working that night

on Cross's shift, told Cross to write a report. Cross complied, summarizing her complaint as follows:

> I have been having problems w/Sam. today I get to work & every time he seen me he had made childish sounds, imatating me being a crybaby, then denis came up to me and told me that Sam was talking about me giving him a blow job and wanting to give him one! he gave me a ride on the golf cart[2] and tryed to make me fall out & about did i told him to knock it off, so then im down at the shack and he keeps making moves like hes going to hit me. So then I had had enough so i told him to grow up, he started screeming at me telling me to shut the F up, kiss his ass, and it only goes on & on Sherry [Chambers] seen the whole thing.

Russo reported the incident to Riddle, who forwarded Cross's complaint to Human Resources, which conducted an investigation. Rizvic was interviewed and denied having spread a rumor about Cross performing oral sex. Chambers, who had observed part of the encounter, told Human Resources that she did not believe Rizvic had actually made the comment about Cross, and she stated that Cross regularly picked on Rizvic by tripping or slapping him. Notwithstanding the conflicting versions of the dispute, Prairie Meadows suspended Rizvic and terminated his employment shortly thereafter because it determined that he had violated the workplace violence policy by threatening Felic for accusing him of starting the rumor.

Cross left Prairie Meadows on September 19, 2007, and never returned.[3] In the course of pursuing this lawsuit, Cross described a number of incidents of sexual harassment that she had not reported while working at Prairie Meadows.

---

[2]The record reflects that the valets frequently used a golf cart to go to and from parked vehicles.

[3]Although Cross originally maintained that she was terminated for reporting the harassment, the district court concluded that her termination theory was not reasonably supported by the evidence, a ruling that Cross has not appealed.

Cross also stated that her supervisors contributed to the poor working environment. Riddle made a number of offensive comments about women, telling Cross that women were "worthless," that they should not have the right to vote, and that they should "bow down" to men. Riddle also squeezed Cross in the neck and shoulder area on three or four occasions. Fucaloro made sexual jokes in front of Cross, told Cross he had had a sexual dream about her, and pinched her legs on several occasions. Fucaloro also called Cross a "bitch" several times. Cross never confronted Riddle or Fucaloro about their offensive conduct and she never reported the harassment to Human Resources or any other member of Prairie Meadows management.

The district court concluded that Prairie Meadows was entitled to summary judgment because the incidents of harassment that Cross reported were not severe or pervasive enough to establish a hostile working environment. The district court also found that Cross could not show that Prairie Meadows knew or should have known about the unreported harassment but failed to take proper remedial action.

II.

We review the district court's grant of summary judgment *de novo*. Cheshewalla v. Rand & Son Const. Co., 415 F.3d 847, 850 (8th Cir. 2005). Summary judgment is proper when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008). To survive summary judgment, a plaintiff must substantiate her allegations with enough probative evidence to support a finding in her favor. Id.

Cross claims that Prairie Meadows violated Title VII by subjecting her to a hostile work environment.[4] To establish a *prima facie* claim of hostile work environment by non-supervisory co-workers, a plaintiff must show (1) that she belongs to a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on her membership in a protected group; (4) that the harassment affected a term, condition, or privilege of her employment by creating a hostile work environment; and (5) that the employer knew or should have known about the harassment and failed to take proper remedial action. Alagna v. Smithville R-II Sch. Dist., 324 F.3d 975, 979 (8th Cir. 2003). For purposes of summary judgment, Prairie Meadows concedes the first three factors. Thus, the question is whether the harassment rose to the level of a hostile work environment and, if so, whether Prairie Meadows knew or should have known about the harassment and failed to take appropriate corrective action.

The standard for demonstrating a hostile work environment on the basis of sexual harassment is a demanding one. LeGrand v. Area Res. for Cmty. and Human Servs., 394 F.3d 1098, 1101 (8th Cir. 2005). "Title VII does not prohibit all verbal or physical harassment and [it] is not a general civility code for the American workplace." Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006) (internal quotations omitted). Actionable conduct must therefore be extreme rather than merely rude or unpleasant. LeGrand, 394 F.3d at 1101. A plaintiff must establish that discriminatory intimidation, ridicule, and insult permeated the workplace. Rheineck v. Hutchinson Tech., Inc., 261 F.3d 751, 756-57 (8th Cir. 2001). In determining whether a plaintiff has demonstrated a hostile work environment, we consider the totality of the circumstances, including the frequency

---

[4]We use the same framework to analyze Cross's claims under both Title VII and the Iowa Civil Rights Act. See Van Horn v. Best Buy Stores, L.P., 526 F.3d 1144, 1147 (8th Cir. 2008) ("In most respects, Iowa courts have used the analytical framework used for Title VII claims, and have looked to federal law for guidance, in deciding cases under the ICRA because the ICRA is modeled in part on Title VII.").

and severity of the conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the plaintiff's job performance.  Id. at 757.

## A. The Reported Incidents

We agree with the district court's conclusion that the reported harassment was not so severe or pervasive that it met the high threshold for a hostile work environment.  Cross reported four discrete incidents over a period of two years.  She first complained to Fucaloro that Rizvic had grabbed her hair and pulled her out of the valet shack.  Cross also reported that Rizvic brushed the back of his hand across her breast in a purported effort to wipe something off her shirt and that he responded in an angry and physically threatening manner when she rebuffed his request that they be "more than friends."  Finally, Cross reported that Rizvic spread a rumor that she had performed oral sex on him.  Taken together, these four incidents over Cross's two-year period of employment are insufficient to establish that the work environment was so permeated with discriminatory conduct that it altered a term, condition, or privilege of her employment.  See, e.g., Duncan v. General Motors Corp., 300 F.3d 928, 935 (8th Cir. 2002); see also Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1988) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.") (internal citation and quotations omitted).  This conclusion is supported by the evidence that the harassment did not unreasonably interfere with Cross's job performance, as Cross testified that despite Rizvic's offensive conduct, she was able to perform her job well.  See Stuart v. General Motors Corp., 217 F.3d 621, 633 (8th Cir. 2000) (holding that the plaintiff could not demonstrate a hostile work environment because, among other things, she was able to perform her duties unimpeded by the harassment).  Accordingly, Cross has not demonstrated a genuine issue of material fact with respect to whether the reported harassment rose to the level of a hostile work environment.

We further conclude that even if the reported incidents rose to the level of a hostile work environment, Cross could not show that Prairie Meadows failed to respond adequately to her complaints. After Cross told Fucaloro that Rizvic had pulled her hair, Fucaloro addressed all of the valets and admonished them to avoid horseplay. Cross contends that this response was inadequate for two reasons—first, because she did not believe that the misconduct was mere horseplay; and second, because Prairie Meadows's harassment policy required Fucaloro to report the incident to Human Resources. For purposes of summary judgment, we credit Cross's statements about the severity of the misconduct. It is undisputed, however, that Fucaloro received conflicting reports about what had happened, with Rizvic and Chambers expressing the view that Cross had overreacted to a playful tug of her hair. In these circumstances, Fucaloro's admonition that the valets should avoid horseplay was not a failure to take appropriate remedial action. As to Cross's second argument, it suffices to say that the obligations of an employer under Title VII are not defined by the strictures of its own policy on harassment. Although an employer's failure to adhere to its internal policies may be relevant in some cases, it does not follow that violation of an internal reporting procedure automatically establishes a failure to take appropriate remedial action under federal law. Employers are free to draft harassment policies that are more stringent than Title VII, and they should be permitted to do so without fear that they will incur additional liability as a result of their efforts. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 764 (1998) ("Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms.").

Cross's last complaint before she left the workplace—that Rizvic had started a rumor that Cross performed oral sex on him—was forwarded to Human Resources, and the company conducted an investigation. Again, reports about the incident conflicted. Rizvic denied starting the rumor and Chambers supported Rizvic's version of events. Prairie Meadows ultimately terminated Rizvic, however, for making a threatening remark in relation to the controversy. Cross faults Prairie Meadows that

-8-

it did not terminate Rizvic as a direct result of her complaint, but she does not explain what additional action the company could have taken once he was gone. In these circumstances, Prairie Meadows's investigation and resolution of this incident cannot be considered a failure to take proper remedial action.

That leaves Cross's two complaints about Rizvic brushing the back of his hand against her breast and about Rizvic's angry response when she told him she did not want to be more than friends. Cross claims that Fucaloro talked to Rizvic about touching her breast but accepted Rizvic's explanation for the behavior. Additionally, when Cross told Fucaloro about Rizvic's angry response to her comment that she wanted only to be friends, Fucaloro replied, "that's just Sam." The record reflects that these two incidents were reported to Fucaloro as isolated acts rather than repeated, ongoing instances of misconduct. Although Fucaloro would have been well advised to take these incidents more seriously, that evidence is not sufficient to establish a Title VII violation.

Moreover, it is undisputed that Cross knew that there were additional avenues that she could pursue if she was unsatisfied with the response to her complaints. Cross also testified that she knew that these alternative routes were effective. Indeed, when Human Resources eventually learned of one of Cross's complaints, the company suspended Rizvic and conducted an investigation. Despite the existence of multiple avenues for obtaining relief, Cross did not seek additional help in eliminating the harassment. The record reflects that Cross's final complaint reached an ultimate decision-maker only because traffic supervisor Russo instructed Cross to write a report, which Riddle then sent to Human Resources.

An employee has a duty to take reasonable steps to prevent harassment and mitigate harm. See Faragher, 524 U.S. at 806-07. When, as here, there are multiple effective avenues for reporting misconduct, "[a] reasonable person, realizing that her [initial] complaints were ineffective, would then seek a remedy elsewhere." Parkins

-9-

v. Civil Constructors of Il., Inc., 163 F.3d 1027, 1038 (7th Cir. 1998). Fucaloro was a relatively low-level employee, with little managerial discretion and no authority to make an ultimate decision about whether Rizvic should have been suspended or terminated for his behavior. Initially, Cross may have reasonably expected Fucaloro to take her complaints more seriously and forward them to Human Resources or someone in upper-level management. This expectation, however, became less reasonable after Cross learned that Fucaloro was unlikely to report her complaints to anyone else. Yet Cross never took any additional steps after finding that Fucaloro's response was unsatisfactory. It is thus difficult to see how she acted reasonably in attempting to stop the harassment.[5] Accordingly, we conclude that the district court did not err in granting summary judgment with respect to the reported misconduct.

## B. The Unreported Incidents

As noted above, since leaving Prairie Meadows Cross has alleged numerous additional instances of harassment involving Rizvic, Fucaloro, and Riddle.[6] The district court concluded that Cross had failed to show that Prairie Meadows knew or

---

[5]Cross's continued reliance on Fucaloro and her failure to pursue any alternative routes to address Rizvic's behavior are even more baffling in light of her claim that Fucaloro participated in the harassment.

[6]Cross has not explicitly appealed the district court's grant of summary judgment with respect to her claims involving Fucaloro and Riddle. In any event, we agree with the district court's well-reasoned conclusion that Cross cannot prevail on these claims. Cross did not tell Fucaloro or Riddle that their behavior was objectionable, and she failed to complain to Prairie Meadows about the harassment, despite its provision of an effective anti-harassment policy. Summary judgment was therefore proper. See Gordon v. Shafer Contracting Co., Inc., 469 F.3d 1191, 1195 (8th Cir. 2006) (explaining that an employer is not liable for harassment by supervisory personnel if the employer can prove that it exercised reasonable care to prevent and promptly correct the harassment and that the employee unreasonably failed to take advantage of corrective opportunities).

should have known about these incidents. To survive summary judgment, a plaintiff must have sufficient evidence that her employer knew or should have known about the harassment and failed to take proper remedial action. An employer therefore cannot be held liable for unreported harassment unless there is some basis for establishing that it knew or should have known about the misconduct.

Cross concedes that she never reported the harassment, and the record shows that it occurred while the valets worked outside, usually in a parking lot and at night. Cross points to the fact that some of the valets who worked with her testified that they witnessed harassment, which she contends supports the inference that the harassment was obvious to everyone at Prairie Meadows. But several other valets who also worked with Cross claimed not to have observed any misconduct, or claimed that Cross participated in the offensive dialogue. The evidence thus does not support the contention that the harassment was so ubiquitous that it could not have been missed. And Fucaloro, Riddle, and other members of Prairie Meadows management all testified that they had no knowledge of the unreported harassment. On this record, the district court did not err in concluding that the evidence was insufficient to raise a genuine issue of material fact as to whether Prairie Meadows knew or should have known about the additional, unreported incidents.

Cross argues that the district court should have considered portions of Fucaloro's testimony that she interprets as meaning that Fucaloro observed Rizvic harassing her on a daily basis. The parts of Fucaloro's deposition to which Cross points, however, do not establish that Fucaloro was aware of misconduct that would rise to the level of a hostile work environment. In referring to Rizvic pulling Cross's ponytail, Fucaloro offered the following explanation:

Fucaloro:    On a daily basis, these guys tease each other like this, joke around, try to keep everything—

| Cross's Attorney: | Are you testifying that Sam [Rizvic] teased Ms. Cross like that on a daily basis? |
|---|---|
| Fucaloro: | They both did to each other, yes. |
| Cross's Attorney: | What other examples can you give of Sam [Rizvic] teasing Ms. Cross on a daily basis? |
| Fucaloro: | Just horseplay stuff. |

Construed in the light most favorable to Cross, that testimony shows that Fucaloro believed that Cross and Rizvic engaged in mutual teasing, not that Cross was sexually harassed. Indeed, Fucaloro later clarified his testimony by answering "no" when asked whether he observed anything remotely sexual in the behavior to which he had referred. Cross contends that Fucaloro's use of the label "horseplay" was inaccurate and self-serving and that a reasonable jury could infer that what Fucaloro considered teasing was actually sexual harassment. She argues that this is so because the hair-pulling incident was a serious assault and because Fucaloro elsewhere admitted that Rizvic's conduct fell under the company's definition of sexual harassment. Fucaloro testified, however, that his perception of the hair-pulling incident as horseplay was based on a witness who had contradicted Cross's description of the encounter. Although Fucaloro may have been wrong about the severity of the misconduct, there is no basis for doubting the sincerity of his belief.

As for Cross's claim that Fucaloro knew that the behavior fell within Prairie Meadows's sexual harassment policy, we have already explained that employers may draft harassment policies that are narrower and more demanding than Title VII. Further, the record does not support Cross's interpretation of Fucaloro's testimony. Fucaloro testified as follows:

| Cross's Attorney: | Let's go back to [the sexual harassment policy]. The fourth bullet point toward the bottom of the |
|---|---|

|                    | page reads, "It is not your job to decide whether or not the complaint should be reported. If it was reported to you, YOU MUST FORWARD THE COMPLAINT TO HUMAN RESOURCES," and "YOU MUST FORWARD THE COMPLAINT TO HUMAN RESOURCES" is in capital letters, isn't it? |
| --- | --- |
| Fucaloro: | Yes, it is. |
| Cross's attorney: | Your failing to take [the hair-pulling incident] to human resources directly violates this policy, doesn't it, sir? |
| Fucaloro: | Yes, it does, but at the time it was more under mutual respect, I believe, rather than being sexual harassment, or harassment. |

When read in its entirety, that testimony does not reasonably support the inference that Fucaloro believed that the hair-pulling incident was sexual harassment. To the contrary, Fucaloro stated that he believed the conduct fell within the company's policy on mutual respect between employees. The record does not support Cross's assertion that Fucaloro intentionally mislabeled Rizvic's conduct or that Fucaloro admitted observing sexual harassment on a daily basis. Even if an inference could be drawn that Fucaloro might have observed additional incidents of sexual harassment, his testimony would not provide enough evidence for a reasonable jury to find that Prairie Meadows was aware of harassment that rose to the level of a hostile work environment. See Anda v. Wickes Furniture Co., Inc., 517 F.3d 526, 533 (8th Cir. 2008) (holding that to survive summary judgment, a plaintiff must have more than a mere scintilla of evidence that an employer was aware of unreported sexual harassment). Accordingly, the district court did not err in granting summary judgment on the ground that Cross failed to show that Prairie Meadows knew or should have known about the unreported harassment.

## III.

The judgment is affirmed.

_____